**The below described is SIGNED.**



**Dated: July 19, 2006**   _____
                                    **JUDITH A. BOULDEN**
                                    **U.S. Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | ) |
| | ) |
| DAVID F. BUTLER AND | ) |
| COLLEEN A. BUTLER, | ) |
| | ) |
| Debtors. | ) Bankr. No. 04-27637-JAB |
| | ) |
| | ) |
| FREELIFE INTERNATIONAL, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary No. 04-3012 |
| | ) |
| DAVID F. BUTLER AND | ) |
| COLLEEN A. BUTLER, | ) Judge Judith A. Boulden |
| | ) |
| Defendants. | ) |
| | ) |

### MEMORANDUM DECISION

Freelife International, LLC (Freelife) filed this denial of discharge adversary proceeding

as part of its continuing effort to collect on several sanction judgments totaling approximately $1

million.  Freelife alleges that after the last and by far the largest of these judgments was obtained,

the Debtors David F. Butler and Colleen A. "Colli" Butler (collectively, the Butlers) engaged in

an elaborate scheme to utilize various business entities and members of their immediate family to

thwart Freelife's collection efforts.  Freelife also alleges that the Butlers have been less than

forthcoming with the Court and parties in interest regarding various aspects of their financial

affairs.  The Butlers counter that to the extent that any particular transaction is legally actionable,

they did not take such action with an improper intent to hinder, delay, or defraud Freelife.  They

also aver that any deficiencies or falsehoods in Court-filed documentation or in sworn testimony

were the result of mere inadvertence and not the result of knowing, fraudulent false oaths.  This

proceeding is to determine whether the Butlers' alleged financial chicanery and alleged attempts

to hide their actions warrant a general denial of their bankruptcy discharge.

A trial was conducted over the course of four days, and the matter was taken under

advisement.  Having considered the stipulated facts, the credibility of the witnesses, the exhibits

received, the arguments of counsel, and having made an independent review of applicable law,

the Court hereby enters the following Memorandum Decision containing Findings of Fact and

Conclusions of Law pursuant to FED. R. BANKR. P. 7052.

## I. FINDINGS OF FACT

A.      **The Parties and the Connecticut Proceedings**

To put this 11 U.S.C. § 727(a)(2) and (a)(4)(A) action in perspective, a description of the

parties and their prepetition relationship is unavoidable.  David and Colli Butler are individuals

currently residing in Alpine, Utah located in Utah County.  Between them, they have six children,

three of which are relevant to the instant proceeding — Travis Butler (Travis) is David Butler's

son from a prior marriage while Holli Campbell (Holli) and Mike Butler (Mike) are Colli

Butler's children from a prior marriage.[1]  By Colli's own testimony, the Butlers are "seasoned"

multi-level or network marketing professionals, having been involved in various network

marketing business ventures since at least the late 1980s.  As described by Colli, network

marketing is fundamentally an alternative method to traditional advertising for product and

service distribution.  Distributors sponsor other distributors (known as "downline distributors" or

simply a "downline"), and commissions are based not only on the original distributors' own

efforts but their downline distributors' efforts as well.[2]  The Butlers are currently distributors for

XanGo, LLC (XanGo), which manufactures the "functional beverage" known as XanGo juice.

Freelife is a network marketing company that manufactures unspecified "health

supplements" and sells them through a network of independent distributors.  The Butlers were at

one time major distributors for Freelife and were directly involved in Freelife's business until

September 18, 2002 when the Butlers were effectively terminated by Freelife.  Colli stated at trial

that the Butlers had been looking at other companies beside Freelife as early as the end of 2001,

but it was ultimately Freelife's termination and the resulting total loss of income that accelerated

the Butlers' job search efforts and led them to becoming XanGo distributors.  On October 21,

2002, Freelife filed a lawsuit against the Butlers and the Butlers' business entity Power Players

International, Inc. (Power Players) in Connecticut state court that ultimately resulted in the entry

of three judgments adverse to the Butlers and Power Players for contempt and sanctions.  The

---

[1]        David Butler testified at trial that he legally adopted Holli at some point subsequent to
his marriage to Colli.  Mike Butler testified to commonly using several different names but will be
referred to only as Mike for purposes of this proceeding.

[2]        Other forms of compensation also exist (at least in the Debtors' current network
marketing business), including unilevel, global, and "power start" bonuses.

first judgment (Judgment I) of $152,500 was entered on December 18, 2002; the second

judgment (Judgment II) of $6,000 was entered on April 22, 2003; and the third judgment

(Judgment III) of $784,605 was entered on May 13, 2003.  The combined total of these three

judgments is $943,105, making Freelife the Butlers' largest unsecured creditor.[3]

The Butlers have filed three separate bankruptcy petitions on August 5, 2003; January 6,

2004; and May 10, 2004, respectively.  The Butlers have created and/or operated their Freelife

and XanGo business activities under a series of corporate entities prior and subsequent to the

filing of their three bankruptcy petitions.  These business entities include the following: Power

Players, which was originally formed by the Butlers to operate their network marketing

distributorship efforts with Freelife; Prosperous Partners International, Inc. d/b/a XanGo Players

(Prosperous Partners); and XanGo Power Players, LLC (XPP).  Prosperous Partners was not

incorporated in Nevada until December 27, 2002 but became operational as a XanGo distributor

on October 30, 2002 — nine days after Freelife commenced the Connecticut state court action.

Unlike Power Players and Prosperous Partners, XPP was never properly organized as a limited

liability company or any other corporate entity.  Colli opened, operated, and controlled each of

the bank accounts for these entities.

---

[3]     One or more of the three Connecticut judgments that form the basis for Freelife's status
as a creditor is currently on appeal.  Freelife moved for exclusion of any evidence or argument as to the
purported invalidity of the contempt judgments, and the Butlers did not oppose the motion.  Accordingly,
the Court entered its Order on Motion to Exclude Evidence Relating to Purported Invalidity of Contempt
Judgments on May 19, 2006 granting Freelife's request.  Even if the contempt judgments were disputed,
however, creditors with disputed claims still have standing to pursue § 727 actions.  *See, e.g.*, *Am.
Motors Leasing Corp. v. Morando (In re Morando)*, 116 B.R. 14, 15 (Bankr. D. Mass. 1990); *Conway v.
First Interstate Bank of Englewood, N.A. (In re Conway)*, 96 B.R. 311 (D. Colo. 1989).  The Butlers are
also plaintiffs in a lawsuit against Freelife originally commenced in California.

The various business and personal bank accounts owned by the Butlers personally or through their various business entities before and after the filing of the present bankruptcy case on May 10, 2004 include, but are not necessarily limited to, the following:

| Account Owner/Holder | Account Number[4] | Bank or Institution |
|---|---|---|
| Power Players | 4546 | Wells Fargo |
| Power Players | 4710 | Wells Fargo |
| Colli and David Butler | 6202 | Wells Fargo |
| Colli Butler | 3848 | U.S. Bank |
| Colli Butler and Mike Butler | 7515 | Wells Fargo |
| Colli Butler and Holli Campbell | 1658 | Wells Fargo |
| Colli Butler | 2347 | E-Trade |
| Colli Butler and Mike Butler | 1107 | E-Trade |
| XPP | 9251 | U.S. Bank |
| Prosperous Partners | 9354 | Wells Fargo |
| Prosperous Partners | 9851 | Bank of America |
| Prosperous Partners | 0273 | Bank One |

## B.    Judgment Domestication and the Utah Proceedings

Freelife domesticated Judgments I and III in the State of Utah on May 27, 2003, and more particularly in the Fourth Judicial District Court, in and for Utah County (Fourth Judicial District Court).  Two days later, the Butlers received an Employer Identification Number for XPP.  On June 27, 2003, one month after Judgments I and III were domesticated in Utah, Freelife obtained its first Writ of Continuing Garnishment (First Garnishment) directing XanGo to garnish monies owed directly to Colli.  That same day, the Fourth Judicial District Court granted an Order in Supplemental Proceedings requiring David, Colli, and Power Players to appear on July 21, 2003 to "answer questions under oath concerning [their] property" and ordering them "not to sell, loan, give away, or otherwise dispose of [their] non-exempt property pending this hearing."

---

[4]    The account numbers have been shortened to the last four digits of the particular account.

But the Butlers did not appear on July 21, 2003.[5]  Instead, that same day, Colli closed her

personal bank account (6202) and both bank accounts held by Power Players (4546 and 4710).

Holli and Mike also closed their respective personal joint bank accounts with Colli (7515 and

1658).[6]  Finally, Colli opened the bank account for XPP with a $1,000 deposit also on July 21,

2003.

Subsequent to issuance of the First Garnishment, Freelife learned that it was of no effect

because XanGo paid money only to the Butlers' business entities and not to Colli herself.  Thus,

Freelife obtained a second Writ of Continuing Garnishment (Second Garnishment) on August 1,

2003 directing Prosperous Partners to garnish monies owed to Colli.  Four days later, the Butlers

filed their first bankruptcy case.  The first bankruptcy case was dismissed by order entered on

October 15, 2003, and Freelife domesticated Judgment II in the Fourth Judicial District Court the

following day.  The Butlers were deposed in connection with the Fourth Judicial District Court

proceedings on November 24, 2003, and a third Writ of Continuing Garnishment (Third

Garnishment) was issued on December 3, 2003 directing XanGo to garnish monies owed to

Prosperous Partners.[7]

---

[5]      Colli testified at trial that she only received notice of the supplemental proceeding on
Friday, July 18, 2003 from Mike and that David was scheduled to be out of town for business on July 21.
She also testified that she contacted the Fourth Judicial District Court and was told that non-appearance
would lead only to issuance of an Order to Show Cause and a resetting of the hearing.  She provided no
explanation as to why she did not appear even if David could not.

[6]      Holli testified at trial that she actually emptied her joint bank account in Wyoming
earlier that day then formally closed the account with Colli at the Alpine branch later in the day.

[7]      Because the garnishments are only valid for 120 days from a specified point in time,
Freelife sought and obtained a fourth and final Writ of Continuing Garnishment (Fourth Garnishment) on
March 25, 2004, two days after entry of the order dismissing the Butlers' second bankruptcy case, again
directing XanGo to garnish monies owed to Prosperous Partners.

Finally, on May 10, 2004, the Fourth Judicial District Court found as a matter of fact and

law that Prosperous Partners is the alter ego of the judgment debtors Colli, David, and Power

Players.  In so holding, the Fourth Judicial District Court found that the observance of the

corporate form of Prosperous Partners would sanction a fraud, promote injustice, or an

inequitable result would follow.  That same day, the Butlers filed the third and present

bankruptcy case.

**C.** **§ 727(a)(2)**

In opening and closing arguments at trial, Freelife framed the core of its allegations

against the Butlers as a game of "hide and seek" involving the Butlers' use of various bank and

other accounts, their children, and their business entities to prevent Freelife from collecting on

the Connecticut judgments.  As such, and given the intricate chronology of events relevant to this

adversary proceeding, it makes sense to flesh out the financial transactions at issue using

Freelife's suggested skeleton.

**Prosperous Partners**

Prosperous Partners became a XanGo distributor on October 30, 2002, nine days after

Freelife filed suit in Connecticut.  On the same day, the Butlers entered into the first of several

ostensible Consulting Agreements (First Consulting Agreement) with Prosperous Partners that

gave the Butlers power of attorney for one year to act in Prosperous Partners' name.  This

authority included, but was not limited to, "purchasing product, authorizing changes to the

distributorship approving transfers, attending events, receiving recognition for the

distributorship, or anything else that the Butlers feel is necessary to build the [Prosperous

Partners] distributorship."  A compensation structure for the Butlers was also set forth in the First

Consulting Agreement.  In addition to receiving "any trips, prizes, or other rewards" from XanGo

during the one-year period following execution of the First Consulting Agreement, the Butlers were to receive 50% of the income generated by Prosperous Partners for the six-month period from November 1, 2002 through April 30, 2002; 25% of the income for the following six months of May 1, 2003 through October 31, 2003; and 10% of the income generated for the one-year period from November 1, 2003 through October 31, 2004.[8]

The First Consulting Agreement also stated that "[t]he Butlers have no ownership in [Prosperous Partners] and have no authority to incur any debt outside of this agreement."  The First Consulting Agreement was substantively amended and its term extended twice — once on November 1, 2003 and again on either December 11 or 12, 2004.[9]  Despite the terms of the Consulting Agreements, despite David's testimony that Holli was made president of Prosperous Partners and "upline" from the Butlers so that income would go to her, and despite Colli's testimony that Prosperous Partners was established both to give Holli a business and the Butlers a source of income, accountant Teressa Toombs (Toombs) testified and Colli has admitted that the money going into and out of the bank accounts for Prosperous Partners was actually allocated or paid to the Butlers on an "as needed" basis and not in compliance with any of the Consulting Agreements.  In fact, the vast majority if not all of the earnings of Prosperous Partners was paid to the Butlers in 2002, 2003, and 2004, yet the Butlers' response to Question 1 of their SOFA

---

[8]        On November 1, 2003, the Butlers entered into an Amended Consulting Agreement.  The Amended Consulting Agreement states that from November 1, 2003 through December 31, 2004, the Butlers shall receive as compensation from Prosperous Partners 25% of the regular monthly commissions and 10% of the quarterly leadership bonus of the XanGo distributorship.  The Second Amended Consulting Agreement of December 2004 provides further significant changes in the Butlers' purported compensation structure.

[9]        The Second Amended Consulting Agreement is unclear as to its specific date of execution.  Also, unlike the prior agreements, the Second Amended Consulting Agreement was signed only by Colli but not David.

indicates a combined income of $34,000 for the year 2003.  At trial, Toombs testified based on

the 2003 tax returns she prepared for the Butlers that the Butlers' actual income for 2003 was

$174,869.  David had no idea how much income the Butlers made in 2003 and made no efforts to

verify the income figures in the Butlers' SOFA.  For her own part, Holli could not recall how

much either the Butlers or she herself were paid during the period of the First Consulting

Agreement.[10]

Prosperous Partners was officially incorporated in Nevada on December 27, 2002, nine

days after entry of Judgment I in Connecticut, and Prosperous Partners' Wells Fargo bank

account (9354) was opened only a couple of weeks later.  The initial board of directors for

Prosperous Partners consisted of only one member, Holli, who was 18 years old and pregnant as

of the date of incorporation and had left California to live briefly with the Butlers in their Alpine

home.  Colli has been the secretary-treasurer for Prosperous Partners since its inception.

Currently, Holli is listed as the president of Prosperous Partners while Colli is listed as the

secretary-treasurer.

On November 25, 2002, shortly after the filing of Prosperous Partners' XanGo

distributorship application and the execution of the First Consulting Agreement but before

Prosperous' Partners formal incorporation, Holli Butler loaned her parents $17,800 that she had

received from an inheritance.[11]  The purported agreement was that the Butlers would build Holli

---

[10]        It is undisputed that the 2004 tax return for Prosperous Partners is incorrect insofar as it
misrepresents the total amount of payments to Holli for "officer compensation."

[11]        Both Colli and Holli testified at some length as to the true nature of the $17,800 money
transfer.  It had been previously characterized by either one or both of them as "prepaid consulting fees,"
an "investment," or a "loan."  It is clear to the Court from all the evidence that the transfer was indeed a
"loan."  Interestingly, when Holli was questioned by the Butlers' counsel as to her understanding of the
legal distinction between an investment and a loan, Holli stated: "You get something out of an
investment."

a distributorship in exchange for the money.  This money was deposited into the Butlers' Power

Players bank account (4710) and then used in its entirety by the Butlers to pay personal expenses.

This transaction is listed on the Power Players bank account statement as a "business loan,"

although none of the $17,800 was used for business expenses or any other business purposes.

The Butlers did not enter into any written agreement or promissory note with Holli regarding the

$17,800, and Holli was not listed as a creditor on the Butlers' Statement of Financial Affairs

(SOFA) and Schedules in this bankruptcy case.

Ultimately, Holli's loan was repaid not by the Butlers but by her brother Mike.  Seventeen

days after the Third Garnishment was issued — the first one issued against Prosperous Partners

— Holli signed several agreements purporting to sell the Prosperous Partners distributorship to

Mike.  Two more agreements were signed on February 27, 2004 during the Butlers' second

bankruptcy case.  The sixth and final Sale Agreement, and the only one actually submitted to

XanGo for approval, was executed on March 3, 2004 and provided for transfer of the Prosperous

Partners distributorship to Mike's business GotXango.com for $11,300.  This is the amount that

allegedly remained due to Holli from her initial $17,800 loan and was paid to Holli by Mike on

the same day the Sale Agreement was executed from an inheritance he received.  Holli used the

money in large part to pay off her Ford Contour.  At the time these various Sale Agreements were

being contemplated and signed, Mike had been held back and was still in high school and getting

ready to go on a mission for the Church of Jesus Christ of Latter-Day Saints.  At trial, Mike

could not recall whether and to what extent he had performed any due diligence regarding the

business operations and financial status of Prosperous Partners.  All of the Sale Agreements were

prepared by Colli.  For his own part, David testified at trial to some general knowledge about the

proposed Prosperous Partners sale and did not recall raising any objections to it.

Although XanGo gave initial approval to the sale on March 16, 2004, XanGo ultimately rejected the sale on or about April 8, 2004.[12]  Shortly before final rejection of the Prosperous Partners sale, Colli was engaged in a flurry of e-mail activity with various representatives of XanGo.  In an e-mail dated April 6, 2004 to Daniela Raynes, Colli pleaded as follows:

> I've been waiting since February for the transfer of businesses.  Can you please find out what the hold up is?  I was promised it would be done in February and every day is a day that Xango could be served a garnishment and I REALLY need it changed before that happens.

In a subsequent e-mail to Ms. Raynes and Cara Jensen dated April 8, 2004, Colli made quite clear her desire that the large quarterly bonus check (for approximately $50,000) owing to Prosperous Partners be paid to GotXanGo.com:

> The bottom line is, the sale HAS to go through right away.  Any minute now Xango could be served with a writ of garnishment against Prosperous Partners, and when they do, they need to get the $200 check, not the big check for the business that was sold to GotXango back in February.
>
> ***
>
> PLEASE help me make sure this happens.  I can't even begin to express the devastation that could occur if this isn't handled immediately.

At some point after XanGo's rejection of the proposed sale but before the filing of the instant bankruptcy case, the Butlers agreed to compensate Mike for the failed attempt to purchase the Prosperous Partners distributorship.  Mike was not listed as a creditor on the Butlers' SOFA and Schedules in this bankruptcy case, but he was paid at least $18,000 total from the Prosperous Partners bank account between July 21 and July 30, 2004.

---

[12]     Interestingly, and contrary to Colli's testimony that Holli wanted to get out of Prosperous Partners because of her struggle with personal issues at the time, Mike signed a Sale Agreement on April 5, 2004 purporting to transfer his own distributorship to Holli for $1.

On May 10, 2004, the filing date of this bankruptcy case, the Fourth Judicial District
Court ruled in connection with the last of several supplemental proceedings that Prosperous
Partners was the alter ego of David, Colli, and Power Players.  Since the creation of Prosperous
Partners, Colli has deposited approximately $25,723.60 in XanGo commission checks payable to
the order of Prosperous Partners into either her personal account or into the Power Players
accounts.  An additional $30,180 in XanGo commissions was also deposited into the XPP
account instead of the Prosperous Partners account.  Colli has admitted to commingling of funds
and that doing so was a "big huge mistake."

**XPP**

Although it never became a distributor of any XanGo product, XPP was ostensibly
established to replace Power Players so that Colli could run her own business and deposit her
commissions into it.  XPP obtained an Employer Identification Number from the Internal
Revenue Service on May 29, 2003, 16 days after entry of Judgment III in Connecticut and two
days after domestication of Judgments I and III in Utah.  XPP was intended to be owned 80% by
Holli and 20% by Colli but was never properly formed as a Utah limited liability company.

In their unsworn Statement of Ownership Interest to the Chapter 7 trustee, the Butlers
state that their income from Prosperous Partners went to XPP until the filing of their third
bankruptcy petition.  Approximately $45,000 was deposited into the XPP account by the end of
2003 alone.  Holli herself testified that she never had anything to do with XPP, and Toombs
testified that nothing in the financial records of the non-entity indicates any involvement by
Holli.  At one point, Colli testified that Holli's interest in XPP was more in the nature of
"collateral" than a "business interest" and functioned as security for Holli until the Butlers'
distributorship-building obligations under the Prosperous Partners Consulting Agreements were

"met."  Colli opened the XPP bank account with an initial deposit of $1,000 on July 21, 2003.

All the earnings of XPP for 2003 and 2004 were paid to the Butlers.

### July 21, 2003

On June 27, 2003, one month after Freelife domesticated Judgments I and III in Utah, the

Fourth Judicial District Court issued the First Garnishment and an Order in Supplemental

Proceedings requiring the Butlers to appear in court on July 21, 2003 and to refrain from selling,

loaning, giving away, or otherwise disposing of any non-exempt property in the meantime.

Instead of appearing in court on that day, Colli, Mike, and Holli emptied and closed all five

Wells Fargo bank accounts involving the Butlers personally or Power Players (of which Colli

was the sole shareholder at all times relevant to this adversary proceeding) — i.e., all of Freelife's

judgment debtors.  The accounts consisted of both Power Players accounts (4546 and 4710),

Colli and David's personal account (6202), and the accounts owned by Colli jointly with Mike

(7515) and Holli (1658).  The Prosperous Partners bank account at Wells Fargo (9354) was not

closed.

In closing both Power Players accounts, Colli withdrew a total of $5,890.55 in cash,

$3,000 of which was transferred into her personal account (6202) to "repay a business loan"

allegedly owed to the Butlers personally before that account was itself closed the same day.  This

was in spite of the fact that Power Players reported excess distributions to the Butlers in 2003

totaling $63,356.  In turn, in closing her personal account, Colli withdrew $3,122.84, $500 of

which was paid to Holli and $200 of which was paid to Mike also on that same day.  Finally,

Colli opened the XPP account on that same day with an initial deposit of $1,000.

Colli testified that the decision to leave Wells Fargo had been made at some point well

before the actual account closures and that it was pure coincidence that the accounts were closed

on July 21, 2003.  She allegedly anticipated that some checks would bounce and wanted to avoid

fees from Wells Fargo that would result.  Mike did not actually recall closing the accounts at all,

and Holli testified that she emptied the account in Evanston, Wyoming then went with her

mother to the Alpine branch to formally close the joint account.  All of this was accomplished on

July 21, 2003.  Colli testified that she only learned of the July 21, 2003 hearing three days earlier

on Friday, July 18 and that David was scheduled to be out of town on July 21.  She claims to

have contacted the court and was told that non-appearance would only lead to issuance of an

Order to Show Cause and the setting of a new hearing date.  At trial, Colli gave no indication as

to why she herself did not appear in court on July 21 even if David was unavailable.

### Frank Butler Distributorship

It is unclear exactly when the Frank Butler distributorship was set up,[13] but the testimony

at trial alleges a range from approximately around the same time as Prosperous Partners'

establishment up to 12 months later.  At any rate, it did have some downline of distributors

"placed" as of the current bankruptcy's petition date and had a marginal value of $28 from a

single sponsorship check received in June 2003.

As discussed *supra*, the Fourth Judicial District Court issued its alter ego ruling on May

10, 2004 finding that Prosperous Partners was the alter ego of David, Colli, and Power Players.

But XanGo's Policies and Procedures prohibit the existence of multiple distributorships under

any one person or entity's control.  XanGo's then-Compliance Manager Mike Mansfield sent a

letter to David and Colli dated July 15, 2004 requiring them to "relinquish control and/or

ownership" of the Frank Butler distributorship within 30 days (August 14, 2004) or the position

---

[13]      Frank is David's middle name.

would be terminated.  On August 6, 2004, David executed a Sale Agreement transferring the

Frank Butler distributorship — which was an asset of the bankruptcy estate — to Holli for $1

despite his testimony at trial that he knew little if anything about the reasons he was signing the

document.  The Butlers' Amended SOFA and Schedules filed on July 28, 2004 allege that the

Frank Butler distributorship is valueless and has received no income to date.

A document styled as a Notice of Abandonment of Interest in the Frank Butler Personal

Services Distributorship Contract (Notice of Abandonment) was then filed with the Court on

August 26, 2004 — 12 days after the termination deadline imposed by XanGo.  The Notice of

Abandonment states that the Frank Butler distributorship is property of the estate "which has no

value and under which no distributorship was ever created."  The Notice of Abandonment also

states that any objections must be filed within 15 days, although there is no specific indication of

what would allegedly happen if no timely objection was filed.  No Court approval of any

proposed abandonment was ever sought or obtained.[14]  By the time the Notice of Abandonment

was filed, however, XanGo's 30-day time limit had already expired and the Frank Butler

distributorship had already been terminated.

Once again, Colli testified that her goal in transferring the Frank Butler distributorship

was to give Holli her own business that the Butlers would develop.  Colli stated in an e-mail to

XanGo Compliance employee Cara Jensen that Holli had been "shafted out of her position

(Prosperous Partners) by the fourth district court in Utah" so the Butlers "agreed to trade

positions so she would have her own and we would build her to Premier to compensate her for

what she lost."

---

[14]        This is particularly curious in light of the representation in the Notice of Abandonment
that it was being filed "in an abundance of caution" given the contentious nature of the case.

**Miscellaneous Transfers to Mike and Holli**

In addition to the transfers already discussed herein, Freelife alleges two other categories
of miscellaneous transfers that are improper under § 727(a)(2).  The first category consists of
transfers from the Butlers' personal account (6202) into the Power Players account (4546).  Some
of these transfers are listed as "loans" or "repayments" of loans between the Butlers and Power
Players.  No agreements exist to memorialize any loans or repayments between the Butlers and
Power Players, and none of these loans or repayments have ever been disclosed by the Butlers in
their SOFA and Schedules.  These transfers are as follows:

| Amount | Date of Transfer | From Account | To Account |
|---|---|---|---|
| $8,000 | January 3, 2003 | Business-4546 | Personal-6202 |
| $4,000 | January 9, 2003 | Personal-6202 | Business-4546 |
| $3,000 | February 5, 2003 | Personal-6202 | Business-4546 |
| $2,500 | February 28, 2003 | Business-4710 | Business-4546 |
| $2,500 | February 28, 2003 | Business-4546 | Personal-6202 |
| $3,000 | March 13, 2003 | Business-4546 | Personal-6202 |
| $4,000 | April 22, 2003 | Business-4546 | Personal-6202 |
| $10,000 | April 23, 2003 | Business-4546 | Personal-6202 |
| $1,000 | May 7, 2003 | Personal-6202 | Business-4546 |
| $200 | May 30, 2003 | Personal-6202 | Business-4546 |
| $400 | June 12, 2003 | Business-4546 | Personal-6202 |
| $200 | June 13, 2003 | Personal-6202 | Business-4546 |
| $1,000 | June 30, 2003 | Business-4546 | Personal-6202 |
| $250 | July 7, 2003 | Personal-6202 | Business-4546 |
| $3,000 | July 21, 2003 | Business-4546 | Personal-6202 |

The second category of miscellaneous transfers consists of transfers from any one of
several bank accounts to Mike and Holli that date back to September 17, 2002.  Transfers to
Holli and Mike that occurred more than one year before the Butlers filed their bankruptcy
petition in this case on include the following:

| Amount | Date of Transfer | From Account | To Individual/ Account |
|---|---|---|---|
| $200 | September 17, 2002 | 4546 | Holli/Wells Fargo |
| $200 | September 17, 2002 | 4546 | Mike/Wells Fargo |
| $900 | January 15, 2003 | 4546 | Holli/Wells Fargo |
| $200 | January 15, 2003 | 4546 | Mike/Wells Fargo |
| $500 | February 5, 2003 | 6202 | Holli/Wells Fargo |
| $200 | February 5, 2003 | 6202 | Mike/Wells Fargo |
| $200 | February 19, 2003 | 6202 | Holli/Wells Fargo |
| $100 | February 19, 2003 | 6202 | Mike/Wells Fargo |
| $300 | February 24, 2003 | 6202 | Holli/Wells Fargo |
| $100 | February 28, 2003 | 6202 | Mike/Wells Fargo |
| $200 | March 12, 2003 | 6202 | Holli/Wells Fargo |
| $1,000 | March 17, 2003 | 6202 | Holli/Wells Fargo |
| $100 | March 17, 2003 | 6202 | Mike/Wells Fargo |
| $150 | March 24, 2003 | 6202 | Mike/Wells Fargo |
| $100 | March 31, 2003 | 6202 | Mike/Wells Fargo |
| $120 | April 17, 2003 | 6202 | Mike/Wells Fargo |
| $500 | April 21, 2003 | 6202 | Holli/Wells Fargo |
| $110 | April 21, 2003 | 6202 | Mike/Wells Fargo |
| $200 | April 23, 2003 | 6202 | Mike/Wells Fargo |
| $100 | May 6, 2003 | 6202 | Holli/Wells Fargo |
| $60 | May 6, 2003 | 6202 | Mike/Wells Fargo |

Transfers to Mike and Holli that occurred within one year of the Butlers' petition between

May 10, 2003 and May 10, 2004 include the following:

| | | | |
|---|---|---|---|
| $30 | May 14, 2003 | 6202 | Mike/Wells Fargo |
| $100 | June 12, 2003 | 6202 | Mike/Wells Fargo |
| $100 | June 12, 2003 | 6202 | Holli/Wells Fargo |
| $500 | July 21, 2003 | 6202 | Holli/Wells Fargo |
| $200 | July 21, 2003 | 6202 | Mike/Wells Fargo |
| $200 | September 4, 2003 | 9251 | Mike |
| $200 | October 24, 2003 | 9251 | Mike |
| $200 | December 16, 2003 | 9251 | Holli |
| $214 | February 5, 2004 | 9251 | Mike |

Transfers to Mike that occurred after the Butlers filed their petition on May 10, 2004

including the following:

| | | | |
|---|---|---|---|
| $10,000 | July 21, 2004 | 9851 | Mike/E-Trade |
| $7,000 | July 21, 2004 | 9851 | Mike/E-Trade |

| $1,000 | July 23, 2004 | 9851 | Mike/E-Trade |
|---|---|---|---|

It is these postpetition transfers and the purported transfer of the Frank Butler distributorship that form the basis of Freelife's § 727(a)(2)(B) cause of action. All remaining alleged transfers were prepetition and form the basis of Freelife's § 727(a)(2)(A) cause of action.

**D.     § 727(a)(4)(A)**

Improper acts alleged under § 727(a)(2) are also often alleged as improper under § 727(a)(4)(A), and this case is no different. Thus, the facts stated above will be incorporated herein by reference. To the extent that Freelife's § 727(a)(4)(A) cause of action is based on facts discussed throughly *supra*, the Court will only briefly repeat such discussion.

**Business Activities**

The Butlers made numerous transfers from their personal bank account at Wells Fargo (6202) into the account for Power Players (4546). Some of these transfers are listed as "loans" and "repayments" of loans between the Butlers and Power Players, and other times are listed as "transfers." No agreements exist to memorialize any loans or repayments between Power Players and the Butlers, and none of these loans or repayments have ever been disclosed by the Butlers in any of their bankruptcy statements. Toombs testified to extensive commingling of funds by the Butlers between their business and personal accounts that made exact accounting quite difficult. David testified that he had no idea what the Butlers' income was over the past several years, that he made no efforts to verify the 2003 income listed in response to SOFA Question 1, and that in all financial and legal matters he simply defers to Colli's judgment and essentially never questions the brief "rundowns" she gives him on various issues. He also testified, oddly, that he considers Colli an "honorable woman" and "seriously honorable" even though she has "made

mistakes" and "does not have the education for this type of thing." David holds a business

degree from Brigham Young University.

### Holli as Creditor

Although Holli's $17,800 loan to the Butlers is listed on the relevant Power Players bank

account statement as a "business loan," it is undisputed that the money was used entirely to pay

for the Butlers' personal expenses.[15] Freelife alleges that the miscellaneous payments made by

the Butlers to Holli following the loan were payments on that antecedent debt, but Holli was

never disclosed as a creditor in the Butlers' original SOFA and Schedules or any of the three

subsequent amendments thereto. Additionally, no payments to Holli were listed in the response

to Question 3.b. on the SOFA. Colli testified before the Chapter 7 Trustee on May 13, 2005 that

the Butlers had not paid any money to Holli in the Butlers' personal capacities and had not paid

any money to Holli as a creditor.[16]

This is true even though other individuals with similar business-building agreements with

the Butlers such as Graeme Smith, Eileen Cohen, and Scott Barefoot were listed as creditors.

Colli testified that the differences were that only Holli's Consulting Agreement involved building

an entire distributorship and that Holli's Consulting Agreement had been "met" by the time this

bankruptcy case was filed whereas the obligations to the other individuals had not. Holli had

allegedly received everything she was owed per the terms of the Consulting Agreement by

compensation through Prosperous Partners and then building her distributorship following the

---

[15]    Paragraph "y" of the Final Pretrial Order's statement of undisputed facts contains the admission that all of the $17,800 was used for personal expenses by the Butlers. This is inconsistent, however, with Colli's testimony at trial regarding her belief that some of it was used for business building.

[16]    This testimony was given in connection with this adversary proceeding during a Federal Rule of Bankruptcy Procedure 2004 exam, not in connection with the main case.

attempted sale of Prosperous Partners to Mike.  Again, however, it is undisputed that the Butlers

received the vast majority if not all the income from Prosperous Partners for 2002 through 2004.

### Tom Ferrier as Creditor

Freelife alleges that on September 23, 2003, Colli's brother-in-law Tom Ferrier (Ferrier)

loaned $5,500 to the Butlers and that the Butlers made two loan repayments from the XPP

account to Ferrier on December 4, 2003 and December 16, 2003 totaling $825.  As with Holli,

the Butlers never disclosed the payments to Ferrier in response to Question 3.b. on their SOFA

nor listed Ferrier as a creditor on their Schedules.  Upon questioning by the Chapter 7 Trustee at

the same Federal Rule of Bankruptcy Procedure 2004 exam in which payments to Holli were

discussed, Colli specifically told the Chapter 7 Trustee that she would amend her SOFA and

Schedules accordingly to include Ferrier as a creditor.  This was never done.

At trial, the testimony regarding the $5,500 was highly inconsistent.  Colli initially

testified that Ferrier was a creditor of the business instead of the Butlers personally and that she

only learned of XPP's non-formation sometime in 2005.  David also acknowledged the $5,500

transaction but said that he considered it more of a "help" than a "lend" and that he did not

consider Ferrier as a creditor because money often goes back and forth between family members.

Toombs then testified that she booked the $5,500 note payable to Ferrier based on Colli's own

statements to her that Ferrier loaned the Butlers the money to help them out through some

financial hardship, but, in spite of David's apparent acknowledgment of the "help" from Ferrier,

Ferrier himself testified that he had no recollection of ever making a $5,500 loan to the Butlers.

Only upon being recalled near the end of trial, Colli testified to her belief that the listing of a note

payable to Ferrier for $5,500 on the XPP General Ledger was simply due to an accounting

mistake after Colli took $6,000 out of the Prosperous Partners account in September 2003 for

"consulting fees" then put $5,500 into the XPP account.  The $825 payments with the notation

"repay biz loan" on the checks were allegedly on account of the Butlers' business use of Ferrier's

credit card to purchase minimal XanGo product, not because of any $5,500 loan.  Interestingly, it

was this same type of financial transaction between the Butlers and Ferrier that led the Court to

find in October 2004 that Ferrier was an undisclosed postpetition creditor.

### Mike as Creditor

At some point after XanGo's final rejection of the Prosperous Partners sale from Holli to

Mike but before the filing of this bankruptcy case, the Butlers agreed to compensate Mike for the

$11,300 payment he made and that Holli had already spent.  The three postpetition transfers at

issue all came from the Prosperous Partners account (9851) and total $18,000.  One of those

transfers for $10,000 was a wire transfer to a brokerage firm named "Wilson-Davis Comp." that

is identified in the current financial records for Prosperous Partners as "legal fees" after being

reclassified from "owner equity."  The transfer was actually a stock purchase for Mike.

Mike has never been disclosed as a creditor on the Butlers' SOFA and Schedules, and no

postpetition payments were disclosed on the Butlers' Monthly Financial Reports before this case

was converted from Chapter 11 to Chapter 7.  Colli essentially admitted the existence of the

agreement to repay Mike for his transferred inheritance when she testified that Mike took the

payment of stock as satisfaction of the debt, although she testified in October 2004 that Mike had

not yet been paid.  She testified at trial only that she could not remember why there was a

discrepancy with her earlier testimony.

**The Butlers' Attorney's Fees**

In addition to the alleged prepetition financial dealings between the Butlers and Ferrier, the Court ruled on October 29, 2004 that Ferrier was an undisclosed postpetition creditor who was paying the Butlers' legal fees and vacated the Order approving Ferrier's payment of legal fees that had been based on sworn representations that Ferrier was not, in fact, a creditor of the Butlers. The Court also revoked the appointment of Paul Toscano as counsel for the Butlers as Chapter 11 debtors-in-possession.

Also in the context of attorney's fees, Colli testified in the Butlers' first meeting of creditors before the Chapter 7 Trustee that the Butlers' attorney's fees were being paid by an organization called the Distributor Rights Association (DRA). The President of the DRA, Rodney Cook, testified in deposition that the DRA has never paid any money from its accounts for attorneys' fees to the Butlers although individual members of the DRA may have personally paid money to the Butlers for attorney's fees. Colli testified that she believed her testimony about the DRA's payment of legal fees was true at the time but she later learned that individuals were paying the money and not the organization. Colli did not disclose the names of those individuals.

**Power Players of XanGo**

In her deposition before the Chapter 7 Trustee, and again in her deposition in the instant proceeding, Colli testified that she never had any interest in a Nevada entity called Power Players of XanGo, LLC (PPX) and that the sole owner and operator of that entity was her blind stepson Travis. Colli is listed as a co-signor on the PPX bank account, but both Colli and David testified that this was only because Travis needs assistance with his financial affairs due to his blindness.

Freelife alleges that the Bank One business account card shows Colli as a "managing member" of PPX.

David testified to using the PPX account for business-building activities on Travis' behalf (such as a helicopter excursion for client development) and using at least $1,000 from the PPX account for personal expenses when the Butlers ran out of money during a XanGo-affiliated trip to Italy one month before this third bankruptcy filing.  No interests in PPX were ever disclosed by the Butlers on their SOFA and Schedules.  At trial, David ultimately testified as follows regarding the Butlers' holding of any interests in PPX:  "By your legal definition, yes.  By our definition, no."

### Frank Butler Distributorship

On August 26, 2004, the Butlers filed their Notice of Abandonment which stated that the Butlers and the Chapter 11 estate were abandoning any and all interest in the Frank Butler distributorship.  The Notice of Abandonment states that abandonment was appropriate because the Frank Butler distributorship had no value.  The Butlers' Amended SOFA and Schedules filed on July 28, 2004 also indicate that the Frank Butler distributorship is valueless and has received no income to date.

E.    **The Butlers' Credibility**

In addition to deciding whether Freelife has proven its *prima facie* case, the Court must determine if the Butlers' explanations regarding their financial affairs and the disclosure thereof are credible or whether the Butlers were actually trying to hinder, delay, or defraud Freelife.  The Court has had the opportunity to judge the credibility and demeanor of the Butlers, especially in the context of their testimony regarding intra-family transactions.  The Court finds Colli to be generally evasive, reluctant to make a definitive or committing statement, and lacking in

credibility.  She consistently takes no responsibility for her own actions, preferring instead to

blame her problems on others.  David professes ignorance of most events and transactions,

asserts that he was too involved in making money to verify the financial and transactional

information Colli told him, and his testimony was often inconsistent and largely unhelpful in

terms of giving actual, straightforward answers to the questions posed.  Both Colli and David use

their family to obscure transactions and motivations behind a web of related party entities, but,

when it suits, retreat to the position that their true motivation was not an attempt to hinder, delay,

or defraud but simply protection of their children.  The Court's careful study of the Butlers'

demeanor on the stand coupled with the substantive content of their testimony leads the Court to

the conclusion that many of the Butlers' explanations of their conduct are simply not credible.

## II.  CONCLUSIONS OF LAW

A.      § 727(a)(2)

Section 727(a)(2) provides:

(a)  The court shall grant the debtor a discharge unless–

* * *

(2)  the debtor, with intent to hinder, delay, or defraud a creditor or
an officer of the estate charged with the custody of property under
this title has transferred, removed, destroyed, mutilated, or
concealed, or has permitted to be transferred, removed, destroyed,
mutilated, or concealed—

(A) property of the debtor, within one year before the date of the
filing of the petition; or

(B) property of the estate, after the date of filing the petition[.][17]

---

[17]      11 U.S.C. § 727(a)(2).

Section 727 of the Bankruptcy Code "allows debtors to receive a general discharge of their obligations in keeping with the primary purpose of bankruptcy law, to give honest debtors a fresh start unhampered by the pressure and discouragement of preexisting debt."[18]  In exchange for that "fresh start," the Code requires debtors to accurately and truthfully present themselves before the court.[19]  "[G]ood faith and candor are necessary prerequisites to obtaining a discharge."[20]  The grounds for denial of discharge contained in § 727(a) are exhaustive; other "equitable" grounds may not be added.[21]  And "[e]xceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor."[22]  "[A] total bar to discharge is an extreme penalty."[23]

To succeed on its Amended Complaint, Freelife must prove each element of either § 727(a)(2)(A), § 727(a)(2)(B), or § 727(a)(4)(A) by a preponderance of the evidence.[24]  If Freelife establishes a *prima facie* case for denying the Butlers' discharge under § 727, the burden

---

[18]     *Farouki v. Emirates Bank Inter., Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994); *see also Structured Assets Serv. v. Self (In re Self)*, 325 B.R. 224, 236 (Bankr. N.D. Ill. 2005).  This adversary proceeding was commenced in a case filed before the general effective of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[19]     *Farouki*, 14 F.3d at 249.

[20]     *E. Diversified Distr., Inc. v. Matus (In re Matus)*, 303 B.R. 660, 670 (Bankr. N.D. Ga. 2004).

[21]     *See generally Yadidi v. Herzlich (In re Yadidi)*, 274 B.R. 843 (9th Cir. BAP 2002).

[22]     *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002); *see also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[23]     *Rosen v. Bezner*, 996 F.2d 1527, 1534 (3d Cir. 1993).

[24]     *See Brown*, 108 F.3d at 1293; *In re Stewart*, 263 B.R. 608, 611-12 (10th Cir. BAP 2001); *First Nat'l Bank v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991); *In re King*, 272 B.R. 281, 288 (Bankr. N.D. Okla. 2002).

of going forward shifts to the Butlers.  The ultimate burden, however, always rests with the creditor to prove grounds for denial of the Butlers' discharge.[25]

"Under § 727(a)(2)(A), an objection to discharge will be sustained if the objecting party alleges and proves the following elements: (1) the debtor transferred, removed, destroyed, mutilated or concealed property; (2) belonging to the estate; (3) within one year of filing the petition; and (4) with the intent to hinder, delay or defraud a creditor of the estate."[26]  The elements of § 727(a)(2)(B) are "substantially the same except that the plaintiff must prove that the debtor transferred or concealed property of the estate after the bankruptcy petition was filed."[27]  As the statutory language makes clear, denial of discharge "need not rest on a finding of intent to *defraud*.  Intent to hinder or delay is sufficient."[28]  "Case law treats 'intent to hinder or delay' as an intent to improperly make it more difficult for creditors to reasonably collect on their debts."[29]

---

[25]     *King*, 272 B.R. at 288 (citing *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994)); *see also* FED. R. BANKR. P. 4005.

[26]     *In re Self*, 325 B.R. at 237 (Bankr. N.D. Ill. 2005); *see also Brown*, 108 F.3d at 1293 (same).  More precisely, prepetition transfers must be of property of the *debtors*, not property of the *estate*.  *See In re Seay*, 215 B.R. 780, 788-89 (10th Cir. BAP 1997); *Kontrick*, 295 F.3d at 736.

[27]     *In re Juehring*, 332 B.R. 587, 591 (Bankr. N.D. Iowa 2005); *see also In re Stanke*, 234 B.R. 449, 456 (Bankr. W.D. Mo. 1999).

[28]     *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996) (emphasis in original); *see also Cadle Co. v. Marra (In re Marra)*, 308 B.R. 628, 630 (D. Conn. 2004) (citing *Bernard* and *NCNB Texas Nat'l Bank v. Bowyer (In re Bowyer)*, 916 F.2d 1056, 1059 (5th Cir. 1990)).

[29]     *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 854 (Bankr. N.D. Tex. 2003) (providing examples); *see also Bank of Oklahoma, N.A. v. Boudrot (In re Boudrot)*, 287 B.R. 582, 586 ("Thus, debtors can be said to act with an intent to hinder their creditors if they intend to impede or obstruct them.  They can be said to act with intent to delay if they intend to slow or postpone their creditors."); *In re Weber*, 99 B.R. 1001, 1017 (Bankr. D. Utah 1989) ("Certainly however, such a drastic remedy as a denial of discharge should not be applied to insignificant or trivial delay of creditors, for the majority of creditors in a bankruptcy could be said to suffer hindrance or delay.  To the contrary, the hindrance or delay must significantly impact the property rights of the creditor to its detriment.  Such

A denial of discharge under either subsection of § 727(a)(2) requires proof of *actual* intent to hinder, delay or defraud a creditor; however, such intent may be proven by circumstantial evidence or by inferences drawn from a debtor's course of conduct.[30] "A single wrongful act or omission may be sufficient to prove actual intent, however, evidence of a pattern of wrongful behavior presents a stronger case."[31] "In determining whether a debtor has acted with intent to defraud under § 727, the court should consider the debtor's 'whole pattern of conduct.'"[32]

As such, the fundamental inquiry is really a totality of the circumstances test that necessitates an examination of all the facts and circumstances;[33] however, courts have generally acknowledged particular factors or "badges of fraud" that serve as indicia of the improper intent required by § 727(a)(2).

---

action must result in a reduction of assets available to creditors so as to substantially and materially hinder or delay their ability to obtain repayment."). *Cf. Mill Creek Lumber & Supply Co. v. Stripling*, 135 B.R. 133 (N.D. Okla. 1990), *aff'd* 947 F.2d 954 (10th Cir. 1991) (rejecting the argument that "the transferred property must have some value" as a prerequisite to a finding of fraudulent intent).

[30]     *See Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991); *Job v. Calder (In re Calder)*, 907 F.2d 953, 955-56 (10th Cir. 1990) (citing *Farmers Coop. Ass'n of Talmage, Kansas v. Strunk (In re Strunk)*, 671 F.2d 391, 395 (10th Cir. 1982)).

[31]     *Matus*, 303 B.R. at 672.

[32]     *Id.*

[33]     *See, e.g., Brown*, 108 F.3d at 1293 ("The mere fact that a transaction occurred soon before the filing of bankruptcy does not necessarily support the inference of fraud.  The circumstances of the transaction must be examined.") (internal citation omitted); *Moore v. Lang (In re Lang)*, 246 B.R. 463, 469 (Bankr. D. Mass. 2000) ("But no debtor will admit to an improper intent.  The Court must therefore consider the surrounding facts and circumstances and draw inferences of a debtor's actual intent from that debtor's action."); *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 611 (10th Cir. BAP 2001) ("The [§ 727] cases . . . are peculiarly fact specific, and the activity in each situation must be viewed individually.").

Although the Tenth Circuit has not set forth any specific list of "badges of fraud," these badges normally include the following: "(1) lack or inadequacy of consideration for transfer; (2) existence of a family, friendship, or special relationship between parties; (3) attempt by debtor to keep transfer secret; (4) financial condition of the party sought to be charged both before and after transaction; (5) existence or cumulative effect of pattern or series of transactions or course of conduct after incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) overall chronology of events and transactions."[34]  In appropriate circumstances, some courts have also considered as badges of fraud: (1) the retention of possession, benefit, or use of the property in question; (2) a purported transfer of all or substantially all of the debtor's property; and (3) the instrument affecting the transfer suspiciously stating that it is in fact bona fide.[35]  "One of these factors may be sufficient to find actual fraudulent intent; an accumulation of several such factors strongly indicates that the debtor possessed the requisite intent."[36]

Consideration of the "monetary value of the assets converted" is also relevant in determining whether the requisite fraudulent intent exists, but it is not dispositive.[37]  This is

---

[34]       *First Savings Bank v. Turner (In re Turner)*, 335 B.R. 755, 761-62 (Bankr. D.N.M. 2005); *see also Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983) (enumerating various badges of fraud).  The Tenth Circuit has stated that a "business purpose," even one of potentially questionable ethics, may either argue against or completely negate a finding of bad intent under § 727(a)(2).  *See Brown*, 108 F.3d at 1293; *In re Thurman*, 901 F.2d 839, 842 (10th Cir. 1990). However, "business purposes" cannot be confused with nor can they override the Bankruptcy Code's condemnation of statutorily prohibited transfers.  And bare desire to avoid having one's income garnished serves no manner of business purpose.

[35]       *Lang*, 246 B.R. at 469 n.9.

[36]       *Womble*, 289 B.R. at 854.

[37]       *See Stewart*, 263 B.R. at 611; *see also In re Dennis*, 330 F.3d 696, 702 (5th Cir. 2003) ("Although a transfer to a relative might suggest intent, a minimal transfer just as strongly suggests a lack of intent.  Other courts agree that the low value of assets is one factor to be considered when determining

because at all times, intent is the appropriate focus.  "[P]roof of harm is not a required element of

a cause of action under Section 727."[38]  So while an intent to prefer one creditor over another is

not equivalent to an intent to hinder, delay, or defraud,[39] it is also true that discharge may be

denied even if a debtor's scheme is ultimately unsuccessful so long as the requisite intent is

proven.[40]

"Evidence of fraudulent conduct which itself cannot form the basis for denial of discharge

nevertheless may be considered on the issue of fraudulent intent.  Fraudulent transactions that

occur outside of one year prior to bankruptcy help to solidify the presumption drawn from the

conduct in question.  While these acts are not grounds for objection to discharge, an inference of

a continuing course of fraudulent conduct can be drawn when these acts are combined with those

fraudulent acts performed within one year of filing."[41]

Under the Bankruptcy Code, "transfer" is defined in the broadest terms possible as "every

mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or

parting with property or with an interest in property, including retention of title as a security

---

whether the debtor had an intent to defraud.") (internal quotes omitted).

[38]    *In re Smiley*, 864 F.2d 562, 569 (7th Cir. 1989); *see also Village of San Jose v.
McWilliams*, 284 F.3d 785, 793 (7th Cir. 2002) (same, citing cases).

[39]    *Marra*, 308 B.R. at 630.

[40]    *Smiley*, 864 F.2d at 569 ("[W]here there is a material misrepresentation the degree of
dishonesty is not measured.  In addition, a fair reading of the statute makes it clear that so long as there is
an *intent* to hinder delay, or defraud, in combination with an act such as a transfer, then a debtor should
be denied the privilege of discharge.  The statute does not provide that the creditors must have, in fact,
been hindered, delayed or defrauded.") (internal citation omitted); *see also Mill Creek Lumber & Supply
Co. v. Stripling*, 135 B.R. 133 (N.D. Okla. 1990), *aff'd* 947 F.2d 954 (10th Cir. 1991) (rejecting the
argument that "the transferred property must have some value" as a prerequisite to a finding of fraudulent
intent).

[41]    *In re Locke*, 50 B.R. 443, 452 (Bankr. E.D. Ark. 1985).

interest and foreclosure of the debtor's equity of redemption . . . ."[42]  Essentially, a "transfer" is
any disposition of an interest in property which includes a transfer of possession, custody, or
control even if there is no transfer of title and which also includes deposits to, withdrawals from,
and transfers between bank accounts or similar accounts.[43]

But just as intent to hinder or delay suffices even without intent to defraud, concealment
suffices as a prohibited act even without a prohibited transfer.[44]  "Concealment is not confined to
physical secretion.  It covers other conduct, such as placing assets beyond the reach of creditors
or withholding knowledge of the assets by failure or refusals to divulge owed information."[45]  "A
concealment for purposes of § 727(a)(2) consists of failing or refusing to divulge information to
which creditors were entitled.  A concealment will be found when a debtor purports to transfer an
asset, making it appear as if he no longer owns it, but he in fact retains an interest in the asset."[46]
"Concealment includes preventing discovery, fraudulently transferring or withholding knowledge
or information required by law to be made known."[47]

---

[42]    11 U.S.C. § 101(54).

[43]    S.Rep. No. 989, 95th Cong., 2d Sess. 27 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787,
5813; *see also Clark v. Wilbur (In re Wilbur)*, 211 B.R. 98, 104 (Bankr. M.D. Fla. 1997) (citing *Bernard
v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1282 (9th Cir. 1996)); *Camacho v. Martin (In re Martin)*, 88
B.R. 319, 322-23 (D. Colo. 1988) (denying discharge for hindrance and delay when debtor was clearly
playing "hide and seek" with bank account funds to thwart state court judgment creditor's collection
activities).

[44]    *Permitting* a prohibited transfer or concealment to occur is likewise sufficient; no
affirmative act of transfer or concealment is required.  11 U.S.C. § 727(a)(2).

[45]    6 Collier on Bankruptcy ¶ 727.02[6][b] (Alan N. Resnick & Henry J. Sommer eds.,
15th ed. rev.).

[46]    *Self*, 325 B.R. at 238 (internal citations and quotes omitted).

[47]    *In re Scott*, 172 F.3d 959, 967 (7th Cir. 1999) (internal citations and quotes omitted)
(citing *U.S. v. Turner*, 725 F.2d 1154 ,1157 (8th Cir. 1984) ("Clearly concealment means more than
'secreting'; one does not have to put something in a hidden compartment, a safe, or a hole in the

It is always the case that any improper acts under § 727(a)(2) must occur within the one

year prior to the bankruptcy case being filed; "anything occurring before that one year period is

forgiven."[48] But "[u]nder the 'continuous concealment' doctrine, a concealment will be found to

exist during the year before bankruptcy even if the initial act of concealment took place before

this one year period as long as the debtor allowed the property to remain concealed into the

critical year."[49]

### Prosperous Partners

The evidence fully attests to Holli being the owner of Prosperous Partners in name only.

Prosperous Partners was created nine days after the Butlers were sued in Connecticut state court,

which in and of itself is not particularly meaningful given the Butlers legitimate need for a new

source of income.  But the subsequent operation of Prosperous Partners was wholly under Colli's

control and evinces the requisite bad intent required by § 727(a)(2)(A).

The Butlers utilized Prosperous Partners as their own personal pocket book while

engaging in extensive commingling of personal and business funds.  The compensation structure

in the various Consulting Agreements was not adhered to, and all of Prosperous Partners' income

with the exception of some minimal payments in 2004 ended up in various other bank accounts.

The culmination of these financial shenanigans was the attempted sale of Prosperous Partners to

---

backyard in order to 'conceal' it.  It is enough that one 'withholds knowledge,' or "prevents disclosure or recognition.'"). It is worth noting that the Tenth Circuit has opined in dicta that "the inference of fraudulent behavior flowing from a concealment is greater than from a transfer."  *Brown*, 108 F.3d at 1293 n.1.

[48]     *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993) (cited by *In re Kontrick*, 295 F.3d 724 (7th Cir. 2002)).

[49]     *Id.* (citing *In re Olivier*, 819 F.2d 550, 555 (5th Cir. 1987)).

GotXanGo.com in a blatant attempt, as evidenced by Colli's plaintive e-mails, to prevent Freelife
from garnishing money owed to Prosperous Partners.

The Butlers' argue in opposition both that no transfer actually occurred and that their
intent was simply to provide a business for Mike, despite his apparent lack of business
sophistication and his impending plans to begin a church mission, while acceding to Holli's
desire to leave the business.  Neither of these arguments rings true.  Much was made of the
Bankruptcy Code's definition of "transfer" at trial and whether this includes "attempted"
transfers or requires an actual, completed transfer.  Although the question seems interesting at
first blush, it is actually meaningless.  For one, the Bankruptcy Code recognizes "conditional"
transfers and includes transfers of possession, custody, or control even if there is no transfer of
title.  Holli herself testified that she had nothing to do with Prosperous Partners after its putative
sale to GotXango.com, which clearly qualifies as a "transfer" under § 727(a)(2)(A).  Even if
there were no transfer, however, "attempted" transfers such as the one at issue in this case can be
viewed as "concealments."  The alleged disposition of Prosperous Partners combined with the
retention of a secret interest in the property would also qualify the Prosperous Partners sale as a
prohibited act under § 727(a)(2)(A).

Of course, to be actionable under § 727(a)(2)(A), the transferred or concealed property
must be the debtors' property; however, many of the transactions in this case including the ones
involving Prosperous Partners, were effected through actual or supposed corporate entities.  But
the Butlers' discharge may still be denied under appropriate circumstances.  The Court finds the
case of *In re Bonham*, 224 B.R. 114 (Bankr. D. Alaska 1998) to be most on point with the
singular facts of the present case.  First, the Fourth Judicial District Court ruled that Prosperous
Partners was the alter ego of both of the Butlers individually and of Power Players on May 10,

2004 — the same day the Butlers filed this third bankruptcy case.  As in *Bonham* and the federal

court's findings regarding that debtor's securities violations, this Court should give collateral

estoppel effect to the Fourth Judicial District Court's alter ego ruling.[50]  Independent of that

ruling, however, this Court has found enough evidence on its own to justify piercing the

corporate veil under Utah law given the Debtors' disregard of the corporate form and use of

various real and imaginary "corporations as [their] own pocket book."[51]  And finally, to the

extent that any of the transfers involved the non-existent entity XPP, the Butlers had no corporate

shield to hide them despite their belief to the contrary.[52]   Thus, certain transfers or concealments

including the disposition of Prosperous Partners are potentially actionable under § 727(a)(2)(A).

The Butlers' alternative argument as to the Prosperous Partners transfer is that it was

accomplished without the requisite intent, but the Butlers' explanations in this regard are

similarly hollow.  Colli and Holli both testified that Holli wanted to get out of Prosperous

Partners because of turmoil in Holli's personal life, but this is inconsistent with execution of a

near-simultaneous Sale Agreement transferring Mike's distributorship to Holli for $1 and with

the attempted sale only a few months later of the Frank Butler distributorship to Holli for $1.  At

the time, the only differentiating factor between Prosperous Partners and these latter two

distributorships was the specter of Freelife.  And because Colli had all real trappings of control

over Prosperous Partners, she did her best to avoid Freelife's collection activities as it related to

---

50      *Cf. In re Stewart*, 263 B.R. 608 (10th Cir. BAP 2001) (rejecting appellant's contention
that the debtors' failure to disregard the corporate form postpetition as they had prepetition required a
finding of false oath when debtors failed to pierce the corporate veil *of their own accord* and failed to list
assets of their purported alter ego).

51      *Bonham*, 224 B.R. at 116;

52      *Cf.* UTAH CODE ANN. § 48-2c-602(1) (imposing joint and several liability on "[a]ll
persons who assume to act as a company without complying with this chapter").

the Prosperous Partners entity.  The preponderance of the evidence demonstrates to the Court's

satisfaction that the Butlers improperly engaged in a game of "hide and seek" to avoid Freelife's

collection efforts, and their discharge could be denied on this ground alone.

**XPP**

The organization and operation of XPP are similar to that of Prosperous Partners.  Colli

testified that the XPP business account was established to take the place of the Power Players

account that she had continued to use for many months after Freelife's termination of the Butlers'

distributorship, and the XPP account was similarly a source of commingled funds.  And although

Holli was nominally given 80% of the business, Holli testified to never having had anything to

do with XPP.  Colli testified at one point to Holli's interest being more in the nature of

"collateral" than a "business interest" and was meant to serve as security that Holli's Prosperous

Partners Consulting Agreement would be "met."

In their unsworn Statement of Ownership Interest to the Chapter 7 Trustee, the Butlers

state that their income from Prosperous Partners went to XPP until the filing of this third

bankruptcy case, and approximately $45,000 was deposited into the XPP account by the end of

2003 alone.  Although Colli testified to having made oblique references to the XPP account in

prior deposition testimony, no interests in XPP have ever been disclosed in this bankruptcy case

and the Butlers concealed the consulting income that was funneled into XPP.  Denial of

discharge is again appropriate.

**July 21, 2003**

The most obviously damning of the Butlers' activities and the ones that provide the

clearest evidence of the Butlers' intent are the events of July 21, 2003.  All in the course of one

day, the Butlers (1) failed to attend a court hearing to discuss the nature and extent of their assets;

(2) closed five Wells Fargo bank accounts with connections to judgment debtors of Freelife (one

of which was actually emptied by Holli in Wyoming earlier in the day) but left open the as-of-yet

untouched Prosperous Partners account; and (3) opened up the XPP account.  No explanation

was provided as to Colli's failure to appear in court even if David was unavailable, and Colli's

self-serving and uncorroborated testimony that the accounts were closed to stave off bounced

check fees strains credulity.  This is especially true in light of the Butlers' long history of paying

bounced check fees prior to July 21, 2003 as shown by their bank statements admitted into

evidence in this case.  It is patently clear to the Court that the actions of July 21, 2003 were taken

with the intent to hinder, delay, or defraud Freelife in its collection activities, and denial of

discharge on this ground is therefore appropriate.

**Frank Butler Distributorship**

The Butlers attempted to abandon the Frank Butler distributorship based on it having no

value shortly after David executed a Sale Agreement transferring it to Holli for $1.  The claim of

no value was false, however, as it at least had $28 from a single sponsorship check.  Moreover,

even if it had no value to the Butlers because of XanGo's single-distributorship policy, a

downline had admittedly been placed and there was potential value to other parties who might

wish to purchase it.  The Butlers concealed their interests in and the value of the Frank Butler

distributorship, however, and the perfunctory Notice of Abandonment only served to mislead.

Denial of discharge on this ground is appropriate under § 727(a)(2)(B).

**Miscellaneous Transfers to Mike and Holli**

Freelife makes much of the numerous transfers to Mike and Holli both before and during

the one-year period preceding the filing of this third bankruptcy case.  Although the testimony

was somewhat confused as to the purpose of particular payments, the Court finds that Freelife

has not proven by a preponderance of the evidence that these transfers were made with the requisite intent to hinder, delay, or defraud Freelife. The regularity and value of these transfers (except for the $1,000 transfer to Holli on March 17, 2003 at the time of her wedding) gives credence to the view that these transfers were in the nature of allowance payments or payments for personal services. Although Freelife presented some minimal evidence that Holli believed some of the transfers might have been repayments on her $17,800 loan, the Court does not believe that Freelife has sustained its burden as to any of these transfers and discharge shall not be denied on these grounds under § 727(a)(2)(A).

Nor shall discharge be denied on the grounds of the $18,000 in postpetition transfers to Mike because Freelife has not shown by a preponderance of the evidence that the transfers were made from property of the estate as required by § 727(a)(2)(B). It is undisputed that the money for these postpetition transfers came from a quarterly bonus check for approximately $55,000, about half of which was made up of prepetition earnings. And Colli testified to her belief that because the Chapter 7 Trustee made an allocation of prepetition and postpetition assets upon conversion of the case, then any remaining funds must have been from postpetition earnings. The Court gives no credit to this argument but need not address its tortured logic because Freelife is the party with the burden of proof in this case. Although Freelife alleged that Colli's argument was made in "conclusory fashion" and that the transferred funds should be presumed to be property of the estate because of the Butlers' "contrived" explanation, there is no legal basis for deeming a transfer to be from property of the estate. Only actual transfers of actual estate property will suffice to deny a debtor's discharge, and it is ultimately Freelife's burden to prove all elements of the allegedly improper transfers, including the element that such transfers be from

property of the estate.  There was and is no burden on the Butlers to show anything when Freelife

has not established a *prima facie* case on these grounds for denial of discharge under

§ 727(a)(2)(B).

**B.** **§ 727(a)(4)(A)**

Section 727(a)(4)(A) provides:

> (a)  The court shall grant the debtor a discharge, unless--
>
> * * *
>
> (4) the debtor knowingly and fraudulently, in or in connection with
>
> the case--
>
> (A) made a false oath or account[.][53]

Thus, a debtor's discharge may be barred if he knowingly and fraudulently makes a false

oath in or in connection with the case.  "A debtor's petition, schedules, statement of financial

affairs, statements made at a 341 meeting, testimony given at a Federal Rule of Bankruptcy

Procedure 2004 examination, and answers to interrogatories all constitute statements under oath

for purposes of § 727(a)(4)."[54]   The same holds true for deposition testimony and testimony at

---

[53]   11 U.S.C. § 727(a)(4)(A).

[54]   *Self*, 325 B.R. at 245; *see also Job v. Calder (In re Calder)*, 907 F.2d 953 (10th Cir.
1990); *Farmers Coop. Ass'n of Talmage, Kansas v. Strunk (In re Strunk)*, 671 F.2d 391 (10th Cir. 1982);
*Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616 (11th Cir. 1984); *Beauboeuf v. Beauboeuf (In re
Beauboeuf)*, 966 F.2d 174 (5th Cir. 1992); *Korte v. IRS (In re Korte)*, 262 B.R. 464 (8th Cir. BAP 2001)
(§ 341 meetings).

other hearings during the course of the bankruptcy case.[55]  The false oath also need not be an

affirmative misstatement; knowing and fraudulent omissions will also suffice.[56]

It is the purpose of § 727(a)(4) to "enforce a debtor's duty of disclosure and to

ensure that the debtor provides reliable information to those who have an interest in the

administration of the estate.  The trustee and the creditors have the right to information that will

allow them to evaluate the case and administer the estate's property.  Thus, complete financial

disclosure is a condition precedent to the privilege of discharge."[57]

Before the Court may deny a debtor's discharge under § 727(a)(4)(A), however, the

plaintiff must demonstrate that the debtor (1) knowingly and fraudulently made a false oath and

(2) that the false oath relates to a material fact.[58]  "A debtor will not be denied discharge if a false

statement is due to mere mistake or inadvertence.  Moreover, an honest error or mere inaccuracy

is not a proper basis for denial of discharge."[59]  However, "reckless indifference to the truth . . .

has consistently been treated as the functional equivalent of fraud for purposes of

§ 727(a)(4)(A)."[60]  Reckless disregard means "not caring whether some representation is true or

---

[55]   *See Dana Federal Credit Union v. Holt (In re Holt)*, 190 B.R. 935, 939 (Bankr. N.D. Ala 1996) (deposition testimony); *Richter v. Gordon (In re Gordon)*, 83 B.R. 78 (Bankr. S.D. Fla. 1988) (other hearings during the course of the bankruptcy case).

[56]   *Self*, 325 B.R. at 245; *Chalik*, 748 F.2d at 618.

[57]   *Id.* (internal quotes and citations omitted).

[58]   *Brown*, 108 F.3d at 1294.

[59]   *Id.* at 1294-95.

[60]   *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987); *see also Jordan v. Bren (In re Bren)*, 303 B.R. 610 (8th Cir. BAP 2004) ("A reckless disregard for both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge.").

false."[61]

It is also true, as with § 727(a)(2), that no actual detriment to a creditor needs to be shown.[62]   A statement or omission is material under § 727(a)(4)(A) if it bears a relationship to the debtors' business transactions, or if it concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property.[63]   It is the debtors' duty to disclose everything, not to make decisions about what they deem important enough for parties in interest to know.[64]

Finally, factors considered under § 727(a)(4)(A) may include the number of omissions;[65] the debtor's profession as it relates to the omissions;[66] how the omission is discovered and how

---

[61]   *Self*, 325 B.R. at 248.

[62]   *See, e.g.*, *Chalik*, 748 F.2d at 617-18 (finding omission of valueless securities to be material for purposes of § 727(a)(4)(A)); *Strunk*, 671 F.2d at 396; *Beauboeuf*, 966 F.2d at 178.

[63]   *Self*, 325 B.R. at 249 (quoting *Chalik*, 748 F.2d at 618); *see also In re Jamison*, 329 B.R. 743, 752 (Bankr. D. Kan. 2005) (citing *Calder* and *Chalik*).

[64]   *Beauboeuf*, 966 F.2d at 178 ("Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them.  The veracity of the bankrupt's statements is essential to the successful administration of the Bankruptcy Act.") (quoting *Chalik*, 748 F.2d at 617).

[65]   *Calder*, 907 F.2d at 956 (noting as significant that the debtor had not one but four separate omissions).

[66]   *See, e.g., id.* (stating that a bankruptcy attorney practicing exclusively in bankruptcy law should have been aware that answers must be complete, truthful and reliable); *Cadle Co. v. King* (*In re King*), 272 B.R. 281, 303 (Bankr. N.D. Okla. 2002) (explaining that the debtor holds an undergraduate degree in business management with a minor in economics and was engaged in the field of commercial real estate transactions and finance for thirty-one years).

quickly the debtor rectifies the omission;[67] any pattern to the omission;[68] "failure to correct all of the inconsistencies and omissions upon making allegedly curative amendments";[69] whether the debtor had access to an attorney;[70] whether the debtor was attempting to place his personal funds beyond the reach of creditors;[71] the seriousness with which the debtor regarded his duties under the Code;[72] and whether the false statements were made in an attempt to advance the debtor's own interests.[73]  Even a debtor's purported "inexperience with financial affairs does not negate the fact that he made false oaths by knowingly swearing to false information."[74]

---

[67]     *See, e.g., Brown*, 108 F.3d. at 1295 (reversing the bankruptcy court because the debtor corrected his omission "very early in the process and of his own accord"); *Henning v. Mellor* (*In re Mellor*), 226 B.R. 451, 459 (D. Colo. 1998) (concluding that an inference of fraud may be made if the amendment is not in fact voluntary because it is offered only after the debtor "knew that the cat was out of the bag" or without adequate explanation of the reason for the initial inaccuracy).

[68]     *Brown*, 108 F.3d at 1295 (discounting the trial court's factual finding of a "pattern of non-disclosure").

[69]     *Mellor*, 226 B.R. at 460.

[70]     *King*, 272 B.R. at 303 (factoring in the debtor's assistance of an attorney who practices regularly before the court).  But even an excuse based on counsel's negligence, assuming it is believed by the Court, "will not necessarily rebut a finding of intent . . . when it is transparently plain that the property should be scheduled."  *In re Davison*, No. KS-04-013, 01-23974-7, 02-6018, 2004 WL 2852352 at *4 n.3 (10th Cir. BAP 2004) (quoting *Hibernia Nat'l Bank v. Perez*, 124 B.R. 704, 710 (E.D. La. 1991)); *see also In re Tully*, 818 F.2d 106 (1st Cir. 1987); *In re Dubrowsky*, 244 B.R. 560 (E.D.N.Y. 2000).

[71]     *Id.* (noting that the debtor changed bank accounts several times pre-bankruptcy to escape garnishment).

[72]     *Id.* (pointing out the debtor's cavalier attitude with respect to his duties under the Code).

[73]     *Woolman v. Wallace* (*In re Wallace*), 289 B.R. 428, 435 (Bankr. N.D. Okla. 2003) (including the interest of the debtor in its analysis).

[74]     *In re Sholdra*, 249 F.3d 380, 383 (5th Cir. 2001).

### Business Activities

It is undisputed that the Butlers engaged in the commingling of funds and that the Butlers made numerous transfers from their personal Wells Fargo bank account (6202) into the account for Power Players (4546). Some of these transfers are listed as "loan" and "repayments" of loans between the Butlers and Power Players, and other times are listed as "transfers." No testimony was elicited to refute the transfers' characterization. It is also undisputed that none of these transactions have ever been disclosed by the Butlers in their SOFA or Schedules even though Power Players was an insider creditor of the Butlers.[75] Thus, to the extent that these transfers from the Butlers to Power Players occurred within the one year prior to the filing of this third bankruptcy case, the Court finds that the Butlers' failure to disclose them was knowing and fraudulent. For these reasons, and for the Butlers' knowing and fraudulent (or at the very least reckless) understatement of their 2003 income in response to SOFA Question 1, denial of discharge is appropriate on this ground.

### Holli as Creditor

Freelife alleges that the Butlers' failure to list Holli as a creditor in their SOFA and Schedules constitutes a false oath. The Court disagrees, and it is Freelife's own successful characterization of Holli's $17,800 payment as a loan that necessarily leads to this conclusion. By the time this third bankruptcy case was filed, the uncontroverted testimony is that the balance of Holli's loan had been repaid in full by Mike. This, coupled with the Court's earlier finding that Freelife did not meet its burden to establish that the miscellaneous transfers to Holli were on account of this $17,800 antecedent debt, requires the Court to find that Holli was not a creditor at

---

[75]    "Insider" is defined in § 101(31) for individuals as including a "corporation of which the debtor is a director, officer, or person in control."

the time this bankruptcy case was filed.  Discharge shall not be denied on the ground of failing to list Holli as a creditor.

### Tom Ferrier as Creditor

As discussed above, the testimony regarding the alleged $5,500 loan from Ferrier to the Butlers was highly inconsistent.  Although the Court is certainly skeptical of Colli's last-minute testimony regarding a purported accounting mistake, her proffered scenario is at least marginally plausible and neither the Plaintiff nor Defendants chose to recall Toombs to provide any further clarifying testimony.  The Court also found Ferrier's own testimony to be credible despite the earlier events in this case surrounding his postpetition payment of the Butlers' attorney's fees.  All told, the evidence presents a very close question, and the weight of that evidence does not preponderate in Freelife's favor.  Accordingly, the Court must find Freelife has not met its burden to prove the Butlers' knowing and fraudulent failure to list Ferrier as a creditor on their SOFA or Schedules.  Discharge shall not be denied on this ground.

### Mike as Creditor

However, the Butlers' failure to list Mike as a creditor and failure to disclose postpetition payments to him in their Monthly Financial Reports both constitute false oaths warranting denial of discharge.  Colli effectively admitted to the existence of a prepetition antecedent debt to Mike arising from the Butlers' agreement to pay him back for the money he paid to Holli for Prosperous Partners.  As such, he was a known creditor that needed to be disclosed but never was.  The Butlers also made no mention of the $18,000 in payments to Mike under penalty of perjury in their Monthly Financial Reports.  And the circumstances surrounding the Prosperous Partners and GotXanGo.com transactions support the view that the Butlers' failure to disclose

Mike's status and his receipt of payments was both knowing and fraudulent.  Thus, denial of discharge is appropriate on these grounds.

### The Butlers' Attorney's Fees

Apart from the legal fees issues connected with Ferrier, Colli testified in the Butlers' first meeting of creditors before the Chapter 7 Trustee that the DRA was paying their legal fees.  This statement was false, but Freelife has not sustained its burden to prove that this false statement was either knowing or fraudulent.  Colli's uncontroverted testimony is that she believed her statement to be true at the time and that she only later learned that the DRA was not a proper legal entity — as such, unknown individuals instead of the organization were actually depositing money for legal fees into her bank account.  Although the Court is skeptical of certain statements made at trial regarding the Butlers' legal fees as they relate to the DRA, it is Freelife's burden to prove its case.  It has not done so with respect to this particular false statement, and discharge shall not be denied on this ground.

### Power Players of XanGo

The Butlers knowingly and fraudulently failed to disclose their interests in PPX in contravention of § 727(a)(4)(A).  The Court fully understands that Colli may have been a co-signor on the PPX account in order to assist Travis in the management of the business' financial affairs, but she nevertheless had an interest in PPX that was not disclosed.  Similarly, David testified to his beneficial use of the PPX account (allegedly at his own discretion and with Travis' permission), including his use of the PPX account to pay for at least $1,000 in personal expenses when the Butlers ran out of money on a XanGo-affiliated trip to Italy just one month prior to filing this third bankruptcy case.  The Butlers knew of their interests in PPX and fraudulently failed to disclose them despite Colli's "understanding" from prior deposition

testimony that she had no "financial" or "beneficial" interest in PPX because she did not receive

any income from it nor did she have any consulting agreement with it.  As stated earlier, there is

no value test in the context of false oaths; only full and complete disclosure will do.  Denial of

discharge is appropriate on this ground.

### Frank Butler Distributorship

The Butlers' Notice of Abandonment stated that the Frank Butler distributorship had no

value and that no distributorship was ever created underneath it, and the Butlers' Amended

SOFA and Schedules filed on July 28, 2004 also indicate that the Frank Butler distributorship is

valueless and has received no income to date.  These statements are false, but only the averments

on the sworn SOFA and Schedules are actionable under § 727(a)(4)(A).[76]  The Frank Butler

distributorship did have at least $28 in actual value from a single sponsorship check, and a

downline had admittedly been placed under it.  Colli's own e-mail of September 9, 2004 to Cara

Jensen provides further support for the view that Colli was aware that the Frank Butler

distributorship did have both a downline and personal sponsorships, and it apparently would have

been quite easy for the Butlers to check the status of the Frank Butler distributorship.  At the very

least, Freelife has shown that the Butlers' disclosures in the SOFA and Schedules with respect to

the Frank Butler distributorship were recklessly made without concern for their truth or falsity,

which is sufficient for purposes of § 727(a)(4)(A).  Denial of discharge is appropriate on this

ground.

---

[76]        The Notice of Abandonment was filed by the Butlers through their counsel of record at
the time, but it was only signed by counsel and was neither sworn under oath nor declared under penalty
of perjury in accordance with 28 U.S.C. § 1746.  Therefore, although the Court certainly does not
condone any misrepresentations in filed documents, any false statements in the Notice of Abandonment
are not independently actionable under § 727(a)(4)(A).

## C.   Denial of Discharge as to David Butler

Finally, whether under §727(a)(2) or (a)(4)(A), "the intent to defraud requisite under 11 U.S.C. § 727 must be shown for each debtor. . . . [T]he Code does not allow attribution of intent from spouse to spouse."[77]  But even David's assertion of total, purposeful disconnect from any financial or legal matters does not save the day.  "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath."[78]  As stated earlier, reckless disregard is sufficient to make a finding of the requisite bad intent under § 727, and *permitting* property to be transferred or concealed is sufficient under § 727(a)(2) specifically.  The Court has no doubt that David's conduct fits into both of these categories.

David's general approach to his financial and legal affairs — as well as his approach to this bankruptcy case and his duty as a debtor — can best be summarized in his own words.  In describing his knowledge about money paid to Prosperous Partners and his general knowledge and involvement with the Butlers' business and financial affairs, David testified on an earlier occasion as follows:

> I don't know what those checks are.  I don't even know what that position made last month.  I don't know what we made last month. I don't pay any attention.  I do that on purpose.  I have to—I have to feed the kids.  So I just talk on the phone.  And I purposely don't know anything.  I just don't want to know anything because I don't like to get into the negativity, the evil that's going on.  I just—I don't like the appearance of it.  I just talk to people on the phone.

---

[77]    *In the Matter of Reed*, 700 F.2d 986, 993 (5th Cir. 1983); *see also In re Wessels*, 79 B.R. 826, 828 (N.D. Iowa 1987) (same).

[78]    *In re Tully*, 818 F.2d 106, 111 (1st Cir. 1987); *see also In re Dubrowsky*, 244 B.R. 560, 576 (E.D.N.Y. 2000) (quoting *Tully*); *Self*, 325 B.R. at 246 ("Debtors have the ultimate responsibility for the accuracy of the information contained in their schedules, which cannot be avoided by playing ostrich.").

This is consistent with the general theme of David's testimony at trial that he purposely

avoids involving himself in the Butlers' financial matters and that he simply trusts whatever Colli

passingly proffers to him without any independent investigation.  This is inconsistent, however,

with the actions of an honest and truthful debtor who takes his obligations under the Bankruptcy

Code seriously.

### III.  CONCLUSION

The primary purpose of bankruptcy law is to give *honest* debtors a "fresh start," and

certain provisions of § 727 prohibit a discharge for those who "play fast and loose with their

assets or with the reality of their affairs."[79]  For the reasons stated above, the Court finds that both

David and Colli Butler have engaged in precisely the kind of conduct prohibited by

§ 727(a)(2)(A) and (a)(4)(A) and their discharge shall accordingly be denied.  Ultimately, the

Court can do little better than quote the words from another denial of discharge case and that

court's findings therein:  "In summary, any one of the Defendants' actions and/or omissions

taken alone would have been sufficient for the Court to deny the Defendants' discharge. . . .

However, when considering the Defendants' actions as a whole, this Court can only come to the

conclusion that the Defendants acted with the requisite actual intent to [hinder, delay, or] defraud

[Freelife]."[80]

A separate Judgment will be issued in accordance with the foregoing Memorandum

Decision.

---

[79]      *Boroff v. Tully* (*In re Tully*), 818 F.2d 106, 110 (1st Cir. 1987) (discussing the purpose of § 727).

[80]      *In re Sowers*, 229 B.R. 151, 158 (Bankr. N.D. Ohio 1998).

_____ooo0ooo_____
**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION** will be effected through the

Bankruptcy Noticing Center to each party listed below.

Richard J. Armstrong
Matthew S. Tarkington
**Wood Crapo LLC**
500 Eagle Gate Tower
60 East South Temple
Salt Lake City, UT 84111
  *Counsel for Plaintiff*

Mona L. Burton
Melissa A. Orien
**Hollard & Hart LLP**
60 East South Temple
Suite 2000
Salt Lake City, UT 84111
  *Counsel for Defendants*

David E. Smoot
Smoot Law LLC
136 South Main Street
Suite 423
Salt Lake City, UT 84101
  *Chapter 7 Trustee*